**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>v.<br>Aaronray James Miguel,<br>Defendant. | No. CR-00-01198-001-PHX-JAT<br>**ORDER** |

Pending before the Court is Defendant Aaronray James Miguel's Motion for Compassionate Release. (Doc. 300). The government filed a Response in opposition to Defendant's Motion. (Doc. 306). Defendant did not file a Reply in support of his Motion. The Court now rules.

## I. BACKGROUND

The government's Response summarizes the relevant facts of this case that led to Defendant's current incarceration. Because Defendant does not dispute the government's factual summary, the Court adopts that summary for purposes of this order:

> On October 31, 2000, Defendant Aaronray James Miguel attended a Halloween party at a home on the Gila River Indian Reservation in Arizona. (PSR ¶ 4.) At that party was Pete Enos, a homosexual man, who was enjoying himself by drinking and dancing to the music playing. (PSR ¶ 3-4.) At one point in the night, however, Defendant decided he had had enough and led Enos outside, where his co-defendant, Dorian Brown, and two minors were waiting. (PSR ¶ 3.)
>
> Once Enos stepped outside, one of the minors knocked him to the ground, and the other three individuals piled on. (PSR ¶ 3.) Defendant, Brown, and the two minors began to kick Enos and yell derogatory epithets at him. (PSR ¶ 4.) Once they decided that he had enough, they dragged him

to some nearby bushes, and Defendant instructed one of the minors to go fetch his horse. (PSR ¶ 5.) Defendant then tied his bloody, semi-conscious victim to the back of the horse and began the slow march to his grave. (PSR ¶ 6.)

Defendant, Brown, and the two minors dragged Enos behind the horse to a site about 157 feet away. (Doc. 234 at 15.) All the while, Enos could be heard "snoring" or "gurgling" on the blood that was filling up his passageways as a result of the beating. (Doc. 213 at 24.) Once he found a good spot, Defendant began digging a hole for Enos by using a shovel he had one of the minors retrieve for him. (PSR ¶ 7.)

When Defendant had dug a shallow-enough grave for Enos, he and the others put Enos' body in it. (PSR ¶ 10.) When they realized that Enos would not fit, Defendant used his shovel to strike Enos' head and neck continuously. (PSR ¶ 7.) Defendant struck the victim 10 times. (PSR ¶ 3.) The most damaging blow, however, came on blow number nine when Defendant used the shovel, and in a downward swing, severed Enos' jugular vein and aortic valve. (Doc. 232 at 16.) Defendant yelled out "Aw fuck! I chopped his head off!" and joked about killing Enos "penitentiary style." (PSR ¶ 6.)

At trial, witnesses testified that while Defendant was chopping away at his victim's neck, Enos could be heard gurgling and snoring. (Doc. 212, p. 21.) Between the Defendant's blows, blood shot up from the victim's neck and sprayed the witnesses in the face. (Id. at 22.) It stained their clothes. (Id.) The medical professional who had performed the autopsy testified that despite the beating, dragging, and assault that Enos sustained, he would have survived if not for the accumulation of those blows. (Doc. 232 at 33.) In other words, Enos remained alive for the entire encounter until the very end. Finally, after placing the victim in his grave, Defendant poured beer out on the victim's face and urinated on his victim's grave. (Doc. 212 at 22; Doc. 213 at 27.)

When Defendant was satisfied with his work, he piled mounds of dirt on top of Enos' body, leaving his genitalia and feet exposed. (PSR ¶ 3.) The four individuals walked back to the party. Defendant asked the witnesses if they were snitches and threatened "to do the same thing to [them] that he did to Pete." (Doc. 213 at 27.) The next day, Defendant was seen laughing while talking about what he had done to Enos. (PSR ¶ 7.)

Defendant was found guilty of second-degree murder motived by his animosity towards the victim's sexual orientation. This Court sentenced him to life in prison. In imposing the life sentence, this Court stated, "the defendant has proven himself to be a menace to society with no regard for human life…" (Doc. 90, p. 40.) On June 30, 2025, the Defendant filed this instant motion seeking compassionate release.

(Doc. 306 at 1-3). Defendant argues that several reasons support his request for a reduced sentence, including "his youthful age at the time of the offense, his turbulent upbringing, his unusually long sentence compared to similarly situated defendants and his rehabilitation." (Doc. 300 at 11).

## II. LEGAL STANDARD

"A federal court generally 'may not modify a term of imprisonment once it has been imposed.'" *Dillon v. United States*, 560 U.S. 817, 819 (2010) (quoting 18 U.S.C. § 3582(c)). Compassionate release is an exception to this general rule, allowing a court to reduce a term of imprisonment if a defendant meets certain requirements. *See* 18 U.S.C. § 3582(c)(1). "Section 3582(c) previously provided for compassionate release only upon motion of the [Bureau of Prisons (BOP)] Director." *United States v. Partida*, No. CR 17-08260-001-PCT-DGC, 2020 WL 3050705, at *1 (D. Ariz. June 8, 2020). Now, after the enactment of the First Step Act of 2018, a defendant may bring such a motion under § 3582(c) after first exhausting administrative remedies with the BOP. *See id.* at *2; *United States v. Johns*, No. CR 91-392-TUC-CKJ, 2019 WL 2646663, at *1 (D. Ariz. June 27, 2019); 18 U.S.C. § 3582(c)(1)(A).[1]

For a court to grant compassionate release, it must find that "extraordinary and compelling reasons warrant" a reduction in sentence "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The Sentencing Commission has passed guidance as to when "extraordinary and compelling reasons" exist for compassionate release. U.S.S.G. § 1B1.13(b). Such circumstances include: (1) the medical circumstances of the defendant, (2) the advanced age of the defendant resulting in "a serious deterioration in physical or mental health," (3) certain "family circumstances" of the defendant, (4) when the defendant was the victim of sexual or physical abuse while in custody, (5) other reasons that are "similar in gravity" to those described in paragraphs (1) through (4), and (6) when the defendant receives "an unusually long sentence." *Id.*

Section 3582(c)(2) also requires a court to "consider[] the factors set forth in section 3553(a) to the extent that they are applicable" when analyzing a motion for compassionate release. The § 3553(a) factors include:

---

[1] Here, the government concedes that Defendant has exhausted his administrative remedies. (*See* Doc. 306 at 3 n.1; Doc. 300 at 3–4). According, the Court finds Defendant has satisfied 18 U.S.C. § 3582(c)(1)(A)'s administrative exhaustion requirement.

> [T]he nature and circumstances of the offense and the history and characteristics of the defendant; the purposes of sentencing; the kinds of sentences available; the sentences and ranges established by the Sentencing Guidelines; relevant policy statements issued by the Sentencing Commission; the need to avoid unwarranted sentencing disparities among similarly situated defendants; and the need to provide restitution to victims.

*United States v. Trujillo*, 713 F.3d 1003, 1008 (9th Cir. 2013) (citing 18 U.S.C. § 3553(a)).

Accordingly, to grant compassionate release, a court must find both an extraordinary and compelling reason for compassionate release and that the § 3553(a) factors warrant release. *See Magana-Lopez*, 2020 WL 3574604, at *2–5 (considering extraordinary and compelling reasons and § 3553(a) factors separately); *United States v. Platt*, No. CR 18195-WJM, 2020 WL 3839847, at *3 (D. Colo. July 8, 2020) (same). "[A]lthough a district court must perform this sequential inquiry before it grants compassionate release, a district court that properly denies compassionate release need not evaluate each step." *United States v. Keller*, 2 F.4th 1278, 1284 (9th Cir. 2021).

## III. DISCUSSION

The decision to grant or deny compassionate release is within the district court's discretion, *id.* at 1281, and the defendant bears the burden of establishing his eligibility for compassionate release, *United States v. Wright*, 46 F.4th 938, 951 (9th Cir. 2022). The court need not "provide a lengthy explanation" for its decision on compassionate release so long as "context and the record reflect that [the court] considered the defendant's substantive arguments and offered a reasoned basis" for its decision." *Wright*, 46 F.4th at 950 (quotations and citation omitted).

### A. Extraordinary and Compelling Circumstances

"[T]he determination of what constitutes extraordinary and compelling reasons for sentence reduction lies squarely within the district court's discretion." *United States v. Pablo*, No. CR 03-00764-PHX-JAT-7, 2024 WL 4365274, at *2 (D. Ariz. Oct. 1, 2024) (internal quotations and citation omitted). The only limitations to this discretion are that the Court is "bound by the Sentencing Commission's policy statement," and that "'[r]ehabilitation . . . alone' cannot be extraordinary and compelling." *Id.* at 2–3 (citations

omitted).

i. Age

Defendant argues that his life sentence without parole is "unusually long" under U.S.S.G. § 1B1.13(b)(6) because "he committed the crime when he was 24 years old" and the legal landscape regarding how to treat youthful offenders has changed since Defendant was sentenced. (Doc. 300 at 11–12, citing *Commonwealth v. Mattis*, 493 Mass. 216, 224 (Mass. 2024) (concluding that a sentence of life without the possibility of parole for "emerging adult offenders" between 18 and 20 years old is unconstitutional because "youthful characteristics must be considered in sentencing" and "the brains of emerging adults are not fully developed and are more similar to those of juveniles than older adults") *and United States v. Sepulveda*, 762 F. Supp. 3d 153, 161 (D.R.I. 2025) (finding defendant's 20-year-old age at the time of the offense presented an extraordinary and compelling reason to modify his sentence because "it is no longer appropriate to sentence a youthful offender, under these circumstances[,] to a sentence of death in prison")).

Subsection (b)(6) states:

> If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, *a change in the law* (other than an amendment to the Guidelines Manual that has not been made retroactive) *may be considered in determining whether the defendant presents an extraordinary and compelling reason*, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

U.S.S.G. § 1B1.13(b)(6) (emphasis added). The findings of a Massachusetts state court and an out-of-district federal court do not constitute a "change in law" as contemplated by § 1B1.13(b)(6).[2] Because *Mattis* and *Sepulveda* are isolated decisions from courts that have no binding authority over this Court and neither decision reflects a broader change in controlling law governing the sentencing of youthful offenders, Defendant fails to demonstrate the applicability of § 1B1.13(b)(6) to this case.

---

[2] Even if Defendant could establish that these cases constitute a "change in the law" regarding the sentencing of youthful offenders generally, he cites no authority that a 24-year-old—Defendant's age at the time of the murder—would be considered a youthful offender or "emerging adult."

Moreover, binding Ninth Circuit authority forecloses Defendant's reliance on his age as an extraordinary and compelling reason for sentence reduction. The Ninth Circuit Court of Appeals has found that "the only way youth can qualify as [an] extraordinary and compelling [reason to justify a sentence reduction] is through subsection (b)(5): the "Other Reasons" provision." *United States v. Bryant*, 144 F.4th 1119, 1126 (9th Cir. 2025), *cert. denied*, 224 L. Ed. 2d 529 (Apr. 27, 2026); *see also* U.S.S.G. § 1B1.13(b)(5) (sentence reduction may be appropriate if "[t]he defendant presents any other circumstance or combination of circumstances that . . . are similar in gravity to those described in paragraphs (1) through (4)"). And the Ninth Circuit has unequivocally held that "youth is not an extraordinary and compelling reason" to reduce a defendant's sentence because the "extraordinary and compelling" reasons identified in U.S.S.G. § 1B1.13(b) "generally refer[] to post-sentencing factual developments, which do not include a defendant's age at the time of the offense." *Bryant*, 144 F.4th at 1127.

Accordingly, Defendant's age at the time of the offense does not establish an extraordinary and compelling reason to reduce his sentence.

ii. <u>Upbringing</u>

Defendant also asks this Court to consider the fact that he had "a very tra[u]matic upbringing" and was molested as a child. (Doc. 300 at 14–15). The government contends that Defendant's upbringing and background were properly considered by the Court at sentencing and should not be reconsidered now to "give Defendant another chance at sentencing because he wishes for something less." (Doc. 306 at 6). The Court agrees.

The Ninth Circuit Court of Appeals has cautioned that the compassionate release statute "does not authorize district courts to take a second bite at the sentencing apple," and that "compassionate release is a limited, discretionary exception to the default rule that a federal defendant will serve his entire sentence." *Bryant*, 144 F.4th at 1127. The relevant inquiry in compassionate release proceedings is whether "*new* circumstances warrant discretionary relief." *Id.* at 1128. Defendant's childhood and traumatic upbringing are not "new circumstances." Because the Court considered these facts over two decades ago when

determining Defendant's original sentence, they do not now establish an extraordinary and compelling reason to reduce his sentence.

iii. <u>Drop-Tag Designation</u>

Defendant argues that his participation in and completion of the gang drop-out program—managed by the National Gang Unit of the FBI—rises to the level of "extraordinary and compelling" under § 1B1.13(b)(5) and is evidence of his rehabilitation under § 1B1.13(d). In support, Plaintiff cites *United States v. Beres*, No. CR 18-58-BLG-SPW-02, 2023 WL 8809320 (D. Mont. Dec. 20, 2023). There, the district court found that Beres's successful participation in the gang "drop out" program rose to "the level of extraordinary and compelling under § 1B1.13(b)(5)." *Id.* at *2. The court acknowledged that a defendant's rehabilitation cannot by itself constitute an extraordinary and compelling reason to justify a reduced sentence, but found that the "drop out" program "is not simply a rehabilitation program." *Id.* The court explained that the program "requires a defendant to provide valuable information to the relevant federal agencies to combat gang activity and could, potentially, endanger the life of a defendant." *Id.* Because "Beres provided a service beyond his own rehabilitation and at his own risk," the court concluded that such conduct could be considered "similar in gravity" to the other extraordinary and compelling circumstances articulated in § 1B1.13(b). *Id.*

Defendant attests that by completing the drop-out program, Defendant "officially and nationally renounced all gang leadership ties with [a] [N]ative [A]merican gang [called] 'Warrior Society,'" and that the "drop tag" was approved by the FBI's National Gang Unit. (Doc. 300 at 17 n.3). As part of this process, Defendant claims he provided the FBI a "service" "at his own risk." (Doc. 300 at 16). Relying solely on *Beres*, Defendant contends that this conduct constitutes an extraordinary and compelling reason to reduce his sentence.

The Court finds this case is distinguishable from *Beres*. Beres was sentenced to 15 years for two drug-related charges and possession of a firearm and the court observed that Beres, independent from the "drop tag" designation, "became a model inmate, participating

in multiple educational and rehabilitative programs while incarcerated, and earning transfer to a minimum-security facility." *Beres*, 2023 WL 8809320 at *2. The court further found that the § 3553(a) factors weighed in Beres's favor. *Id.* at *3. Here, Defendant was sentenced to life imprisonment for a gruesome second-degree murder motivated in substantial part by the victim's sexual orientation. Far from being a "model inmate," Plaintiff has amassed a lengthy disciplinary record while incarcerated and was most recently disciplined in December 2023 for fighting with another inmate. (*See generally* Doc. 306-1, Defendant's Chronological Disciplinary Record). And the § 3553 factors, as discussed below, do not favor a sentence reduction. Accordingly, the Court finds that Defendant's completion of gang the drop-out program does not constitute an extraordinary or compelling reason to reduce his sentence. *See United States v. Hall*, No. 20CR867-CAB, 2024 WL 4547008, at *3 (S.D. Cal. Oct. 22, 2024) (distinguishing *Beres* and similarly concluding that the defendant's gang drop-out status was not an extraordinary and compelling circumstance justifying compassionate release).

**B. Section 3553(a) Factors**

Because Defendant has not met his burden to show that "extraordinary and compelling reasons" warrant a reduction in his sentence, the Court need not address the § 3553(a) factors. *See Keller*, 2 F.4th at 1284. However, even assuming *arguendo* that Defendant had sufficiently demonstrated that extraordinary and compelling reasons exist, the Court concludes that the § 3553(a) sentencing factors do not support a reduced sentence.

"Pertinent factors under § 3553(a) include [(1)] the nature and circumstances of the offense and the history and characteristics of the defendant, [(2)] the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, [(3)] to deter criminal conduct and protect the public, and to provide effective correctional treatment, including education or vocational training and medical care." *Pablo*, 2024 WL 4365274, at *3 (citing 18 U.S.C. § 3553(a)(1), (2)).

Beginning with the "nature and circumstances of the offense," the Court cannot

overstate the heinousness of Defendant's crime. Defendant beat Enos, tied his bloody, half-conscious body to the back of a horse and drug him to his future gravesite, where Defendant proceeded to strike Enos in the neck repeatedly with a shovel until he finally died. Defendant then poured beer on Enos' face, desecrated his grave by urinating on it, and laughed about Enos' death the following day. In short, Defendant tortured Enos in the final minutes of his life. Indeed, this Court specifically recalls the gruesome facts of this case and, as stated at Defendant's sentencing, the Court continues to find that Defendant is a menace to society with no regard for human life. Defendant's cruel, depraved, and evil actions weigh strongly against compassionate release.

Further weighing against compassionate release are the "history and characteristics of the defendant." Defendant's own Motion concedes that he had been incarcerated three times before he was imprisoned for second-degree murder. (Doc. 300 at 15). At age 16, Defendant was sentenced to 5 ½ years in state prison; less than a year after his release, Defendant "caught another case" and was imprisoned for an additional year in the state prison system. (Doc. 300 at 15). Just ten months after being released from prison the second time, Defendant committed the instant offense when he was 24 years old. (Doc. 300 at 15). The fact that Defendant led a life of crime for many years before his imprisonment for the instant offense weighs strongly against a reduced sentence.

Also, the Court does not find that reducing Defendant's sentence would "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." *See* 18 U.S.C. § 3553(a)(2)(A). The Court reiterates the gruesome nature of the crime and Defendant's flagrant disrespect for the law for the entirety of his adult life leading up to his present incarceration. The Court finds that life imprisonment is the only just punishment for Defendant's actions.

The Court further finds that Defendant's continued incarceration is necessary to protect the public. *See* 18 U.S.C. § 3553(a)(2)(C) (courts shall consider the need for the sentence imposed "to protect the public from further crimes of the defendant"). Beyond Defendant's life of crime up to the age of 24, the Court notes that Defendant has amassed

a long disciplinary record in prison, which details various instances of misconduct, including violent conduct against fellow inmates, possession of a weapon, and threats Defendant made against BOP staff members. (*See generally* Doc. 306-1).

Defendant notes that three other people were involved in the underlying offense and requests that the Court "consider whether a reduction in his sentence would lead to substantial sentencing disparities with other criminal defendants convicted of similar conduct." (Doc. 300 at 18); *see also* 18 U.S.C. § 3553(a)(6) (courts shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). Defendant contends that Defendants who were minors at the time of the offense received immunity in exchange for their testimony, and that Dorian Brown was also charged with second-degree murder, but "received only 19 years[,] where [Defendant] was never even offered a plea deal." (Doc. 300 at 19). The Court does not find any *unwarranted* sentencing disparity between Defendant and Brown. Brown received a lesser sentence because he agreed to plead guilty, and as the government notes in its Response, Defendant was not entitled to receive a plea bargain. (Doc. 306 at 7 (citing *United States v. Moody*, 778 F.2d 1380, 1385–86 (9th Cir. 1985) ("There is no constitutional right to a plea bargain, and the decision whether to offer a plea bargain is a matter of prosecutorial discretion.")).[3] Even if the Court were to conclude that an unwarranted sentencing disparity exists between Defendant and Brown, the Court nevertheless finds that the § 3553(a) factors, on balance, strongly disfavor compassionate release.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[3] The government's Response also suggests that Defendant was not offered a plea deal due in part to his "extensive involvement" in the crime relative to the other participants. (Doc. 306 at 7).

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendant Aaronray James Miguel's Motion for Compassionate Release (Doc. 300) is **denied**.

Dated this 21st day of August, 2026.

James A. Teilborg
Senior United States District Judge